IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 2, 2023

# IN RE WILLIAM W.[1] ET AL.

**Appeal from the Circuit Court for Cumberland County**
No. 22CV6876      Caroline E. Knight, Judge

_____

## No. E2023-00565-COA-R3-PT

_____

Mother and Father appeal the termination of their parental rights to their three children. The trial court found, relying on the doctrine of res judicata, that the ground of severe child abuse supported termination and concluded that termination of Mother's and Father's parental rights is in the children's best interests. Mother and Father challenge the trial court's determination that the best interest factors support termination. We affirm the judgment of the trial court terminating Mother's and Father's parental rights.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JEFFREY USMAN, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and CARMA DENNIS MCGEE, JJ., joined.

Jeffrey A. Vires, Crossville, Tennessee, for the appellant, William W.

Cynthia F. Davis, Crossville, Tennessee, for the appellant, Cleopatra W.

Sherrill A. Rhea, Crossville, Tennessee, Guardian ad Litem for the minor children, William W., Warren W., and Willina W.

Jonathan Skrmetti, Attorney General and Reporter; and Mara L. Cunningham, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

_____

[1] "In cases involving the termination of parental rights, it is this Court's policy to remove the full names of children and other parties, to protect their identities." *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *1 n.1 (Tenn. Ct. App. May 15, 2023).

**OPINION**

William W. (Father) and Cleopatra W. (Mother) are the biological parents of three children: William W., Warren W., and Willina W. (collectively, "the Children"). As of the date of trial, the Children were six, four, and two years old respectively. This appeal concerns the May 2022 petition to terminate Mother's and Father's parental rights to the Children on the ground of severe child abuse filed by the Tennessee Department of Children's Services (DCS). The Cumberland County Circuit Court terminated Mother's and Father's parental rights on April 11, 2023. On appeal, Mother and Father contend that the termination of their parental rights was not in the Children's best interest.

DCS first became involved with the family on August 23, 2020, which is the date that Mother gave birth to Willina. A drug test at the hospital confirmed that Mother was under the influence of THC, opiates, and oxycodone, and a subsequent screen revealed that Willina was born with these drugs in her system. Though Father tested negative for any controlled substances at the hospital, he later admitted that he had been smoking marijuana as recently as a month prior to Willina's birth. After receiving Mother's and Willina's test results, DCS requested that both parents participate in programming offered by Multi-Agency Collaboration (MAC) Services. Specifically, representatives from DCS and Child Protective Services directed the parents to Volunteer Behavioral Health for drug and alcohol testing and intensive outpatient treatment (IOP). They also advised Mother to complete programming through the Tennessee Early Intervention System (TEIS) with Willina.

At this point, Mother and Father resided with the Children at an apartment complex in Crossville, Tennessee. After a few months living at this complex,[2] the family moved into a home located in Crossville, Tennessee, which Father inherited from his uncle. The parties disagree about the habitability of the house. According to DCS, this house lacks electricity and running water. Father disagrees. He maintains that the home has working utilities, but Father acknowledges it suffers from other problems, such as broken windows. DCS did not offer the family assistance in terms of repairing this house. Courtney Wicks-Pelfrey, the DCS caseworker who testified in favor of termination at the final hearing, explained that the Department could not help unless at least one of the parents showed they were earning income through some type of employment. In fact, Ms. Wicks-Pelfrey testified that she personally "encouraged them to get employment, so that way they could maintain any efforts [DCS] made into putting into that home."

DCS filed a petition in Cumberland County Juvenile Court on December 28, 2020, seeking to have the Children declared dependent and neglected. While that petition was

---

[2] Father acknowledged that these apartments had "subsequently been condemned," but also noted that the family had vacated prior to the condemnation.

pending, the parents took some, but not all, of the actions recommended by DCS. For example, while Mother attended seven of twelve scheduled visits at Volunteer Behavioral Health, she did not return a single call from TEIS about entering the program with Willina. Father, meanwhile, failed to appear at the appointment he set up with Volunteer Behavioral Health. According to DCS's dependency and neglect petition, which was entered as a trial exhibit without objection, "[t]he parents [were] sporadic in keeping their appointments with the MAC case manager" during this time.

Both parents also participated in drug screens while the dependency and neglect petition was pending. On April 9, 2021, Father tested positive for methamphetamine, amphetamine, and THC. Four days later on April 13, 2021, Mother tested positive for all three of the same drugs. Based on the results of these drug screens, DCS sought custody of the Children and the trial court granted DCS's request. After the trial court placed the Children in DCS custody on April 14, 2021, each child tested positive for methamphetamine, and Willina also tested positive for THC.

Mother and Father created a permanency plan for the Children in cooperation with DCS on April 28, 2021, which was later updated on November 1, 2021, and April 19, 2022, and that plan was ratified by the juvenile court. Among other things, this plan obligated Mother to refrain from using illegal drugs, attend mental health provider services as well as outpatient treatment, and "provide a home free of emotional and psychological stressors for the children." Father had the same obligations placed upon him, but also assumed a duty to "obtain and/or maintain a legal means of support to meet the family['s] needs by applying for employment" to be proved by "provid[ing] a list of efforts to DCS worker weekly until employment or benefits are obtained."

DCS placed the Children with a foster family on June 1, 2021. As part of this arrangement, the Children live with another foster sibling and an adopted child as well. The Children's foster father testified at the final hearing in this case that the Children entered his care with unaddressed speech impediments. However, each child has reportedly improved during the time they have spent with the foster family, overcoming their respective speech impediments. The Juvenile Court's dependency and neglect order indicates that, after entering the foster home, DCS involved TEIS in the Children's lives to provide support in their development. According to the foster father's testimony, the Children "call me Little Daddy, and they call [my partner] Big Daddy." He also testified that the Children would act out and exhibit aggressive behaviors after each visit with Mother and Father. On cross examination, the foster father noted that the Children still call Mother "Mommy" and Father "Daddy," and acknowledged Father's concerns that discussing adoption could make reunification difficult.

On July 20, 2021, the Cumberland County Juvenile Court entered three child support orders that affect the Children. These three orders, which DCS admitted as exhibits at trial without objection, obligated Father to pay exactly $33.33 a month per child in the

form of wage garnishments. Father testified that, during the pendency of the case, he held jobs at "CoLinx," McDonald's, and THK Rhythm, the latter of which was still ongoing at the time of trial.

The Cumberland County Juvenile Court adjudicated each child dependent and neglected on July 28, 2021. The trial court concluded that DCS presented clear and convincing evidence to support its petition and proved that "[r]easonable efforts have been made to assist the parents in remedying the conditions that necessitate foster care." The order additionally noted that, while Mother was attending IOP classes at Bradford, "[b]oth parents were drug screened on 6/8/2021 and mom was positive for buprenorphine and THC, and the father for methamphetamine, amphetamine, and THC." It appears that the Juvenile Court also tested both parents on the day of the dependency and neglect hearing, noting "both parents were positive for THC & buprenorphine. Mother reports that she is prescribed buprenorphine, but Father is not." The Juvenile Court concluded that DCS proved by clear and convincing evidence that the Children were "victims of severe child abuse" under Tennessee Code Annotated section 37-1-102(b)(27).

Sparse evidence is included in the record to demonstrate what occurred between the dependency and neglect adjudication and the filing of the petition to terminate the parents' parental rights. Father tried to attend treatment through "Health Connect" as well as a detox through "the New Leaf," a rehabilitation center. Father concedes, however, that he did not fully complete the New Leaf program; he "only completed detox," not full rehabilitation.

DCS filed its petition to terminate Mother's and Father's parental rights to the Children on May 5, 2022. DCS emphasized that the Children had already been deemed to be victims of severe child abuse. Accordingly, DCS raised severe child abuse as a ground for termination pursuant to Tennessee Code Annotated section 36-1-113(g)(4). DCS also argued that the best interests of the Children support terminating Mother and Father's parental rights. Both parents received service of process on June 3, 2022, and Mother subsequently filed an answer to the department's petition. In it, Mother admitted that the Children were adjudicated dependent and neglected on July 28, 2021, but not that the Children were deemed victims of severe child abuse.

Between the time of filing the petition and the termination hearing, according to Father's testimony, he began working at McDonald's for several months before October 2022. In October, Father contends that he transitioned to working for THK Rhythm. It also appears that both Mother and Father moved in with Father's family "at the end of . . . October" 2022. Father testified that this new home is a furnished dwelling with working utilities.

The trial court held a hearing on DCS's termination petition on May 10, 2023. In addition to introducing numerous exhibits, DCS elicited testimony from Ms. Wicks-

Pelfrey, the DCS case worker assigned to Mother and Father's case. Among other things, Ms. Wicks-Pelfrey recounted the events that formed the basis for the Juvenile Court's decision to adjudicate the Children as victims of severe child abuse, and DCS entered the corresponding order into evidence. She also discussed how, despite the parents trying to engage in some drug treatment, Mother and Father continuously relapsed throughout the case. Ms. Wicks-Pelfrey noted that Mother was arrested on March 9, 2023, for heroin possession. She also discussed the status of the Children in the foster home, noting that during her visits she observed that the Children were, in her opinion, bonded with both foster parents. On cross examination, Ms. Wicks-Pelfrey conceded that Father informed her of his employment with THK Rhythm, but also noted that Father has not provided DCS with a single paystub from that job to confirm his current employment. She acknowledged that the Children also show attachment to Mother and Father, evidenced by calling Mother and Father affectionate names. She also identified three or four visits during the span of DCS's custodial episode that Mother and Father failed to attend.

Though Mother did not take the stand, Father testified. Father discussed the family's housing situation, noting that they intended to live with his father temporarily until they could fix the home he had inherited from his uncle. He also discussed his employment with THK Rhythm and claimed that his wages were being garnished to provide child support to the Children, though he admitted on cross examination that he provided no evidence of these TKH Rhythm paystubs to DCS prior to the hearing as contemplated by the permanency plans.[3] Father admitted that he failed drugs screens and "[m]ost definitely" suffers from a substance abuse problem. He nonetheless emphasized the love he has for the Children and his desire to be reunited with them. On cross examination, DCS probed Father's inability to provide paystubs from his previous jobs. Father conceded that he did not work diligently to procure those paystubs and send them to DCS, blaming his substance abuse. Though Father emphasized that he passed a drug screen in December of 2022, DCS noted that he failed a drug screen within a month of trial, testing positive for methamphetamine, amphetamine, hydrocodone, fentanyl, and marijuana. Additionally, due to his repeated statements that he misunderstood questions during cross examination, the trial court admonished Father for what it considered purposeful avoidance. During the GAL's cross examination, Father claimed that he was unaware of Mother's drug use during her pregnancy with Willina and blamed an unnamed babysitter for the Children's exposure to illicit substances.

On April 11, 2023, the trial court granted DCS's petition to terminate Mother's and Father's parental rights to the Children. In its final order, the trial court stated that it found "all of the State's witnesses to be credible" but "did not find [Father] to be credible." Citing

---

[3] Father had previously provided one or two paystubs from his time at McDonald's. When Father's counsel tried to introduce a copy of what purported to be one of Father's paystubs into evidence, DCS objected on the grounds of hearsay. The trial court sustained DCS's objection, though it permitted Father to discuss "his knowledge about his own pay, child support, and any amount."

the Juvenile Court's dependency and neglect order that specifically labeled the Children as victims of severe child abuse, the trial court deemed the ground of severe child abuse proven by clear and convincing evidence pursuant to the doctrine of res judicata. Finding that DCS provided clear and convincing evidence to support at least one ground for termination, the trial court then moved to the best interest analysis. After discussing facts that supported its conclusions on each factor listed in Tennessee Code Annotated section 36-1-113(i), the trial court ordered Mother's and Father's parental rights terminated and gave DCS "the right to place said children for adoption and to consent to said adoption in loco parentis."

Both parents appeal to this Court, arguing that the trial court erred in concluding that termination was in the Children's best interest. Both the GAL and DCS support the trial court's final order on the merits.

II.

Parents have a fundamental constitutional interest in the care and custody of their own children. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). This fundamental interest is "far more precious than any property right." *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982)). "[P]ublic policy strongly favors allowing parents to raise their biological or legal children as they see fit, free from unwarranted governmental interference." *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010). However, a parent's rights are not absolute and may be terminated on clear and convincing evidence that statutory grounds for termination exist and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c)(1)-(2); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013).

In a termination of parental rights case, we review a trial court's findings of fact de novo on the record with a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *see* Tenn. R. App. P. 13(d). "In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97). The grounds for termination and the determination that termination is in the child's best interest must be established by clear and convincing evidence, that is, evidence that "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts" and that "eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596; *see* Tenn. Code Ann. § 36-1-113(c). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

III.

The trial court terminated Mother's and Father's parental rights to the Children on the ground of severe child abuse, finding severe child abuse to have been conclusively established pursuant to the doctrine of res judicata. Neither parent contests this decision on appeal. Nevertheless, it is incumbent upon this court to address each ground for termination pursuant to the Tennessee Supreme Court's directive to this court to "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26.

A parent's rights to his or her child may be terminated on the basis of severe child abuse. Tenn. Code Ann. § 36-1-113(g)(4) (effective July 1, 2021, to June 30, 2022); *see also In re J.S.*, No. M2022-00142-COA-R3-PT, 2023 WL 139424, at *6 (Tenn. Ct. App. Jan. 10, 2023), *perm. app. denied* (Tenn. Apr. 4, 2023) ("This court applies the versions of the parental termination statutes in effect on the date the petition was filed."). Severe child abuse exists when a parent "[k]nowingly or with gross negligence allow[s] a child under eight (8) years of age to ingest an illegal substance or a controlled substance that results in the child testing positive on a drug screen, except as legally prescribed." Tenn. Code Ann. § 37-1-102(b)(27)(E) (effective July 1, 2021, to June 30, 2022). Here, the trial court observed that the Cumberland County Juvenile Court, in its order adjudicating the Children to be dependent and neglected, specifically found that "these children are victims of severe child abuse" under section 102(b)(27)(E).

As this Court has previously explained, res judicata is a doctrine that treats "an existing final judgment rendered upon the merits . . . by a court of competent jurisdiction, [as] conclusive of rights, questions and facts in issue as to the parties . . . in all other actions in the same or any other judicial tribunal of concurrent jurisdiction." *In re Heaven L.F.*, 311 S.W.3d 435, 439 (Tenn. Ct. App. 2010) (quoting *Galbreath v. Harris*, 811 S.W.2d 88, 90 (Tenn. Ct. App. 1990)). In the context of severe child abuse, res judicata permits a trial court to treat a prior finding of severe child abuse in a dependency and neglect proceeding as conclusive evidence establishing the ground of severe child abuse during a subsequent termination of parental rights hearing. *Id.* All of the parties in this case agree that they were the same parties included in the Cumberland County Juvenile Court's dependency and neglect adjudication, the issue of severe child abuse was plainly litigated during that proceeding, and neither parent appealed that finding of severe child abuse. *See id.* (concluding res judicata applied where all parties were identical and "the issue of whether Mother committed severe child abuse was fully litigated"). Accordingly, the trial court properly determined that the ground of severe child abuse was conclusively established via the Juvenile Court's prior dependency and neglect order.

IV.

If a statutory ground for termination of parental rights has been shown by clear and convincing evidence, the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). The Tennessee Supreme Court has summarized the law regarding the best interest analysis as follows:

Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests." When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ."

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017) (citations omitted).

The nonexclusive factors relevant to the best interest analysis are laid out in Tennessee Code Annotated section 36-1-113(i)(1):

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i) (effective July 1, 2021 to June 30, 2022). The trial court concluded that seventeen of these twenty factors support terminating Mother's and Father's parental rights. However, due to a lack of proof, the trial court concluded that factors (F), (G), and (R) were inapplicable to the facts of this case. DCS does not challenge this determination with respect to factors (F) and (G). DCS does challenge the trial court's decision to ascribe no weight to factor (R), which concerns the health and safety of the parent's current home, and which factor DCS argues supports termination. The trial court indicated that the evidence presented was insufficient regarding the "physical environment" of the parent's home. The trial court's need for greater clarity in evidence presented to make findings on this ground does not appear to be in error.

In a thorough examination, the trial court made detailed findings addressing the best interest factors. Because many of the factors touch on similar factual predicates and involve similar issues, we group our discussion of the best interest factors "based on the overarching themes within the list of twenty factors" under the circumstances of the case. *In re Chayson D.*, 2023 WL 3451538, at *14. We consider first the Children's emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A) (concerning the need for stability), (B) (concerning how changes in caretakers affect child well-being), (D) (concerning parent-

- 10 -

child attachment), (E) (concerning visitation), (H) (concerning attachment to others), (I) (concerning relationships with others), (T) (concerning the parent's fitness and its corresponding impacts). Though competing evidence and testimony exists on several of these factors, we nonetheless conclude that the trial court properly concluded that the balance of these factors support the termination of Mother and Father's parental rights.

It is true that the Children still call Father and Mother "Daddy" and "Mommy," that Mother and Father have participated in the majority of their visits, and that the Children still share a bond with Mother and Father. However, the relationship with Mother and Father is one that produces poor behavior from the Children, and the trial court observed that attachment was not a secure and healthy one. Alternatively, the Children are, however, "extremely bonded" with their foster parents in a healthy and secure relationship. Describing the relationship with the foster parents, the trial court noted that "the Children run to them if something is wrong. They hug them." Foster father testified that the Children also use affectionate names to refer to himself and his partner. Moreover, the Children appear to have exhibited negative reactions to visits with Mother and Father, showcasing poor attitudes and aggressive behaviors at the conclusion of several visits. DCS provided evidence showing that the Children's well-being and development has improved since leaving the parents' custody. The foster parents are providing stability and continuity that Mother and Father cannot.

All three children also appear to have overcome significant speech impediments due in no small part to the support they receive from DCS, TEIS, and the foster family. Under Mother and Father's care, by contrast, the Children received no such assistance. Ms. Wicks-Pelfrey confirmed that Mother never reached out to TEIS, despite being urged to do so, after Willina was born with drugs in her system. We agree with the trial court that removing the Children from their foster home, where they are currently thriving, and returning them to Mother and Father's custody would negatively impact their stability and overall well-being. The trial court found, and the record supports, that Mother and Father "cannot provide for the basic material, educational, housing, and safety needs of the children." While Mother and Father contend that the Children's young ages make separation from the foster family less impactful than it would be at an older age, the trial court found this argument unconvincing. Additionally, the Children have significant positive relationship with their "foster parents' adopted son and their foster sibling." Accordingly, the trial court correctly determined these factors weigh in favor of termination.

We turn next to considerations of the Children's physical environment and well-being. *See* Tenn. Code Ann. § 36-1-113(i)(1)(N) (involving any abuse or neglect present in the parent's home), (O) (involving the parent's prior provision of safe and stable care to any child), (Q) (involving the parent's commitment to having a home that meets the child's needs). The trial court properly determined that these factors support the termination of Mother's and Father's parental rights. Willina tested positive for multiple harmful illegal

- 11 -

drugs upon birth.  Mother and Father continued to relapse—exposing all three Children to methamphetamine, THC, and other drugs in the process.  Furthermore, DCS administered drug screens to each child after the Children were removed from Mother and Father's custody, and each of the Children tested positive.  Though Father contended, without evidence, that an unnamed babysitter was to blame for the Children being exposed to drugs, the trial court found Father's testimony not credible.  The evidence presented indicated that Mother and Father continued to abuse drugs.  Placing the Children with Mother and Father would be returning them to an environment in which Mother and Father continue to abuse drugs without any foreseeable end to their drug abuse, when these same conditions previously resulted in the Children testing positive for drugs.  The trial court did not err in determining these factors favored termination.

Next, we consider Mother's, Father's, and DCS's efforts.  *See* Tenn. Code Ann. § 36-1-113(i)(1)(C) (involving the parent's continuity in meeting the child's needs), (J) (involving the parent's lasting adjustment of circumstances), (K) (involving the parent's use of available resources), (L) (involving DCS's reasonable efforts), (M) (involving parent's sense of urgency in addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest).  Concerning Mother and Father, the trial court found that their efforts were insufficient.  Though it is true that Mother and Father attended some sessions at Volunteer Behavioral Health and Father participated in a detox, the trial court heard credible testimony, unrebutted by both parents, that relapses occurred despite repeated attempts by DCS to assist them.  Furthermore, the trial court concluded, and the record supports, that Mother and Father exhibited a lack of a sense of urgency in addressing the problems that gave rise to the Children being placed in foster care or even getting the Children back from foster care.

Additionally, Father conceded at trial that he did not provide DCS with paystubs aside from one or two during his temporary employment with McDonald's.  Concerning his current position at THK Rhythm, Father admitted that he did not send the department a single paystub.  Parents failed to complete required paperwork that would enable DCS to take further action with regard to various forms of assistance including, for example, water bills and housing.  Additionally, both parents declined to accept other forms of assistance from DCS.  For example, immediately upon intervening in this case, DCS recommended that Mother engage TEIS in order to benefit from programming that would aid herself and Willina.  Mother did not participate in this TEIS programming.  It was only after the Juvenile Court granted DCS custody over the Children that Willina first received TEIS assistance.  Ultimately, the trial court concluded that "neither parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment to their circumstances or conditions."  The trial court concluded that DCS made reasonable efforts and has done more for the parents than they have done for themselves.  The trial court did not err in determining these factors favored termination.

Finally, with regard to support and knowledge of the Children's needs, the trial court

also found that these factors support termination. Tenn. Code Ann. § 36-1-113(i)(1)(S) (addressing parent providing more than token support); (P) (addressing parent's understanding of the child's needs). Relying in part on the facts recited above, the trial court concluded that neither Mother nor Father have a clear understanding of the Children's needs. The record supports this conclusion as to Mother and Father's lack of understanding of the Children's needs.

The record is more muddled on the issue of support. Father testified that that he held multiple jobs during the pendency of this case and that his wages were regularly garnished to provide child support to the Children. The trial court, however, found Father not to be a credible witness. The trial court stated that Father's employment was "new" and that this factor weighed against him because it is limited to "very recent proof, . . . perhaps only one paystub."[4] Based on the state of the record regarding the support issue as to Father and the basis of the trial court's conclusion, there is uncertainty as to whether factor (S) supports termination. Mother also points out in her briefing that "[t]he trial court appears to make no findings regarding" her support to the Children specifically. We agree. Accordingly, the trial court has not made findings as to factor (S) that support terminating Mother's parental rights.

"While determination of the child's best interest may not be reduced to a simple tallying of the factors for and against termination, . . . especially considering the similarities between the factors, we cannot help but acknowledge the overwhelming sense that the [Children's lives] will not be improved by a reintroduction to Mother [and Father]." *In re Chayson D.*, 2023 WL 3451538, at *15 (citation omitted). With the exception of factor (S) as to which there is uncertainty, the record strongly supports the trial court's determinations as to the factors. Furthermore, clear and convincing evidence supports the conclusion that the best interests of the Children favor terminating the parents' parental rights. Accordingly, we affirm the trial court's order terminating Mother's and Father's parental rights.

VI.

In considering the arguments advanced on appeal and for the reasons discussed above, we affirm the judgment of the trial court. The costs of the appeal are taxed to the appellants, William W. and Cleopatra W., for which execution may issue if necessary. The case is remanded for such further proceedings as may be necessary and consistent with this opinion.

---

[4] The trial court sustained objections made by DCS when Father's counsel attempted to enter other paystubs into evidence at trial. Sustaining a hearsay objection, the trial court stated that it would permit Father to "testify as to his knowledge" but not to "the paystub itself." With the paystubs having been excluded, the failure to enter into evidence additional paystubs to reflect paid child support payments becomes questionable ground upon which to rest the trial court's conclusion on this point.

_____
JEFFREY USMAN, JUDGE